# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: | Chapter 7 |
| CENTRAL GROCERS, INC., *et al.*, | Case No. 17-13886 (Jointly Administered) |
| Debtors. | Hon. Pamela S. Hollis |
| HOWARD B. SAMUELS, solely as chapter 7 trustee of the estates of CENTRAL GROCERS, INC., *et al.*,[1] | |
| Plaintiff, | Adversary No. _____ |
| v. | |
| NEWKOT, LTD., MIDKOT, LTD., COALKOT, LTD., LOCKOT, LTD., PEOKOT, LTD., BERKOT'S, LTD., ORKOT, LTD., BRAIDKOT, LTD., ALKOT, LTD., MOMKOT, LTD., WESTKOT, LTD., DIKOT, LTD., WATSEKOT, LTD., WILKOT, LTD., and AROMAKOT, LTD., | |
| Defendants. | |

## ORIGINAL COMPLAINT

Howard B. Samuels, solely in his capacity as Chapter 7 trustee for the bankruptcy estates of Central Grocers, Inc., Strack and Van Til Super Market, Inc., and SVT, LLC, pursuant to Federal Rule of Bankruptcy Procedure 7001, hereby brings this adversary proceeding against Defendants Newkot, LTD., Midkot, LTD., Coalkot, LTD., Lockot, LTD., Peokot, LTD., Berkot's, LTD., Orkot, LTD., Braidkot, LTD., Alkot, LTD., Momkot, LTD., Westkot, LTD., Dikot, LTD.,

---

[1] The Select Debtors in these Chapter 7 cases, along with the last four of each debtor's federal tax identification number, as applicable, are Central Grocers, Inc. (3170), Strack and Van Til Super Market, Inc. (2184), and SVT, LLC (1185).

Watsekot, LTD., Wilkot, LTD., and Aromakot, LTD. (collectively, the "Defendants") and alleges as follows:

## JURISDICTION AND VENUE

1.      This adversary proceeding relates to the above-captioned bankruptcy case (the "Bankruptcy Case"), which was commenced on May 2, 2017 (the "Petition Date") under title 11 of the United States Code (the "Bankruptcy Code").

2.      This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b), as well as Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  This matter is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (B), (E), (F), (H), and (O).

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

4.      The Trustee consents to the entry of a final order or judgment by this Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution with respect to any of the requests for relief set forth in this Complaint.

## PARTIES

5.      Plaintiff HOWARD B. SAMUELS is the Chapter 7 trustee (the "Trustee") for the bankruptcy estates of Central Grocers, Inc. ("CGI"), Strack and Van Til Super Market, Inc. ("Strack"), and SVT, LLC (together with Strack, "SVT").

6.      Defendant NEWKOT, LTD. ("Newkot"), is an Illinois corporation with its principal place of business at 2141 Calistoga Dr., New Lenox, IL 60451.  Newkot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

7.      Defendant MIDKOT, LTD. ("Midkot"), is an Illinois corporation with its principal place of business at 4640 W. 147th Street., Midlothian, IL 60445.  Midkot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

8.      Defendant COALKOT, LTD. ("Coalkot"), is an Illinois corporation with its principal place of business at 100 S. Broadway, Coal City, IL 60416.  Coalkot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

9.      Defendant LOCKOT, LTD. ("Lockot"), is an Illinois corporation with its principal place of business at 500 Summit Plaza, Lockport, IL 60441.  Lockot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

10.     Defendant PEOKOT, LTD. ("Peokot"), is an Illinois corporation with its principal place of business at 312 S. Harlem, Peotone, IL 60468.  Peokot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

11.     Defendant BERKOT'S, LTD. ("Berkot"), is an Illinois corporation with its principal place of business at 20005 S Wolf Road, Mokena, IL 60448.  Berkot's may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

12.     Defendant ORKOT, LTD. ("Orkot"), is an Illinois corporation with its principal place of business at 11333 W. 159th Street, Orland Park, IL 60467.  Orkot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

13.     Defendant BRAIDKOT, LTD. ("Braidkot"), is an Illinois corporation with its principal place of business at 180 N. Front Street, Braidwood, IL 60408.  Braidkot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

14.     Defendant ALKOT, LTD. ("Alkot"), is an Illinois corporation with its principal place of business at 100 Market Place, Manhattan, IL 60442.  Alkot may be served with process

through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

15.     Defendant MOMKOT, LTD. ("Momkot"), is an Illinois corporation with its principal place of business at 159 Sterling Place, Momence, IL 60954.  Momkot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

16.     Defendant WESTKOT, LTD. ("Westkot"), is an Illinois corporation with its principal place of business at 451 N. Locust, Manteno, IL 60950.  Westkot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

17.     Defendant DIKOT, LTD. ("Dikot"), is an Illinois corporation with its principal place of business at 317 W. Waupansie Street, Dwight, IL 60420.  Dikot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

18.     Defendant WATSEKOT, LTD. ("Watsekot"), is an Illinois corporation with its principal place of business at 1152 E. Walnut Street, Watseka, IL 60970.  Watsekot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

19.     Defendant WILKOT, LTD. ("Wilkot"), is an Illinois corporation with its principal place of business at 700 W. Baltimore, Wilmington, IL 60481.  Wilkot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

20.     Defendant AROMAKOT, LTD. ("Aromakot"), is an Illinois corporation with its principal place of business at 200 S. Bridge Street, Aroma Park, IL 60910.  Aromakot may be served with process through its registered agent, Lavelle Law, Ltd., at 1933 N. Meacham Rd., Suite 600, Schaumburg, IL 60173.

21.     Each Defendant is owned and operated by former CGI director John Kotara ("Director Kotara").  At all relevant times, Director Kotara was an acting director of CGI.  For that reason, each Defendant is an insider of CGI and SVT.

## BACKGROUND

## A.  CGI'S COOPERATIVE PROGRAM

22.     CGI was a Chicago-based grocery cooperative with hundreds of members that operated grocery stores located in Illinois, Indiana, Iowa, Michigan, and Wisconsin.  Members joined CGI to participate in its purchasing, dividend, equity, and lending programs.

23.     Members were required to maintain "good standing" status to participate in CGI's programs.  The requirements for good standing, along with the other rights and duties of membership, were set out in CGI's membership agreement (the "Membership Agreement"),[2] its Amended and Restated By-Laws (effective November 2012) (the "By-Laws"),[3] the Rules and Regulations (effective March 2013) (the "Rules & Regulations"),[4] its Amended and Restated Articles of Incorporation (as amended 2015) (the "Articles"),[5] and its Member Loan Policy and Procedure (effective January 2010) (the "Loan Policy").[6]  Each member signed the Membership Agreement, thereby agreeing to comply with the By-Laws, the Rules & Regulations, the Articles, and the Loan Policy.

## 1.  The Purchasing Program

24.     Members in good standing were eligible to participate in CGI's purchasing program.  Members received goods from CGI on account, and CGI received payment through automated clearing house ("ACH") transactions drawn from the member's bank account (the "Purchasing Arrangement").  Members were required to maintain deposit accounts ("Purchase Deposits") with CGI at amounts tied to their weekly buying volume.  *See* Ex. A at 4; Ex. B at 27-

[2] Defendants' Membership Agreements are attached as Exhibit A.
[3] The By-Laws are attached as Exhibit B.
[4] The Rules & Regulations are as Exhibit C.
[5] The Articles are attached as Exhibit D.
[6] The Loan Policy is attached as Exhibit E.

28; Ex. C § 5.  If a member failed to maintain an ACH account or failed to maintain appropriate Purchase Deposits, that member was deemed to be in violation of the By-Laws and was no longer in good standing.  *See* Ex. B at 28-29; Ex. C § 3.  A member also lost its good standing status if payment to CGI was not made within the 12-day payment term.  *See* Ex. B at 28-29; Ex. C §§ 3(d), 6.

26.     To terminate purchasing from CGI, members were required to adhere to the procedure outlined in the By-Laws: a member either had to sell or close all its retail locations concurrently with termination or terminate at fiscal year-end and provide 60 days' written notice to CGI (the "Termination Procedure").  *See* Ex. B at 28.  If a member failed to comply with the Termination Procedure or violated any other provision of the By-Laws, that member was no longer in good standing, and that member forfeited any amount otherwise owed by CGI to such member. *See id.* at 25, 28, 29.

### 2.  The Patronage Dividend Program

26.     Members in good standing were also eligible to participate in CGI's patronage dividend program, which was governed by the By-Laws and the Rules & Regulations.  At the close of each fiscal year, CGI's board of directors (the "Board") determined how much of CGI's profit to retain for costs, debt service, and any other reason deemed to be in the best interests of CGI. *See* Ex. B at 25, 27.  The remaining profit, if any, was then distributed to members as a patronage dividend.  If a member failed to maintain good standing or adhere to any provision of the By-Laws, including the Termination Procedure, it forfeited all rights to patronage dividends.  *See* Ex. B at 25, 29.

27.     Members received their share of a patronage dividend either as a distribution of cash, stock, and credit at the end of the fiscal year, or as quarterly cash payments made in advance of the anticipated year-end dividend, with a final distribution of the balance as cash, stock, and credit at the end of the fiscal year.

28.     On or about September 15, 2016, the Board authorized a $44.5 million patronage dividend, subject to final adjustments, for the fiscal year ending July 30, 2016 (the "2016 Patronage

Dividend"). None of CGI's governing documents, nor any other agreement, required CGI to pay the 2016 Patronage Dividend or any portion thereof. As noted above, the Board had broad discretion under the By-Laws to retain some or all of CGI's profits for costs, debt service, and any other reason deemed to be in CGI's best interests. In fact, when the Board authorized the 2016 Patronage Dividend, CGI was insolvent and had been since at least January 2016.[7]

29.     Shortly after authorizing the 2016 Patronage Dividend, the Board learned that CGI had violated the liquidity covenants in its $150 million credit facility. In turn, CGI's lenders demanded—as a condition for not declaring a default on the credit facility—that CGI defer paying 30% of the 2016 Patronage Dividend until CGI achieved compliance with such liquidity covenants (the "Withheld Dividend").

30.     On or about October 13, 2016, the Board authorized the Withheld Dividend, thereby amending the 2016 Patronage Dividend so that CGI had no obligation to pay the Withheld Dividend until the company was able to make such payment without violating its liquidity covenants. CGI subsequently sent letters to its members, explaining that the Withheld Dividend had been approved and that 30% of each member's 2016 Patronage Dividend would be recorded solely for bookkeeping purposes in the member's deposit account. CGI's financial condition never recovered such that it could pay the Withheld Dividend and comply with the liquidity covenants.

### 3. The Allowance Dividend Program

31.     Members also profited from CGI's participation in allowance programs with its vendors. CGI entered into contracts with its vendors whereby it would commit to purchase a certain amount of product and in return the vendor would provide CGI a rebate—called an allowance—on its purchases.

32.     On October 27, 2016, while insolvent, CGI paid its members over $2,500,000 in dividends from profit it earned on vendor allowance programs (the "2016 Allowance Dividend").

---

[7] *See infra* Section C.

7

None of CGI's governing documents, nor any other agreement, required CGI to pay the 2016 Allowance Dividend.

### 4. The Equity Program

33.     Members in good standing were further eligible to participate in CGI's equity program.  CGI had Class A voting stock and Class B non-voting stock.  Upon joining CGI, every member was required to purchase five Class A shares at $100 par value, and the value of Class A shares always remained $100 per share.  *See* Ex. D at 2-3; Ex. B at 6.  The value of Class B shares was determined based on an annual valuation of CGI.  *See* Ex. B at 2, 9.  Members purchased Class B shares through CGI's stock option program or received such shares as a component of their patronage dividend.  *See* Ex. B at 15-16, 26.

34.     Certain members received Class B shares as a component of their 2016 Patronage Dividend and then immediately requested that CGI redeem those shares.  On or about November 17, 2016, while insolvent, CGI issued redemption checks to requesting members (the "Redemption Payment") in order to redeem Class B shares received as a component of their 2016 Patronage Dividend.  CGI had no obligation to redeem the Class B shares through the Redemption Payment.

### B. DEFENDANTS' PARTICIPATION IN CGI'S COOPERATIVE PROGRAM

35.     Defendants executed the Membership Agreements, thereby becoming bound by those agreements, the By-Laws, the Rules & Regulations, the Articles, and the Loan Policy. Defendants never resigned their CGI membership prior to the Petition Date.

### 1. Receipt of and Failure to Pay for Goods

36.     As of the Petition Date, Defendants had received, but had not paid for, goods on account from CGI in the amount of $1,621,610.11 (the "Unpaid Receivable") and had no cash in its Purchase Deposit accounts as indicated on the Unpaid Receivable Schedule attached as Exhibit F.  Defendants received and accepted the goods but cancelled their ACH accounts before CGI

could draw payment.  Defendants then terminated purchasing from CGI by July 13, 2017, without adhering to the Termination Procedure.

37.     Defendants' failure to remit payment for the Unpaid Receivable, failure to maintain an ACH account, and failure to terminate purchasing in accordance with the Termination Procedure constituted material breaches of the Purchasing Arrangement, the Membership Agreement, the By-Laws, and the Rules & Regulations.

38.     Accordingly, Defendants (a) owe the Unpaid Receivable to CGI, (b) are no longer members in good standing, (c) lost all rights to Patronage Dividends, and (d) forfeited any other amount owed to them by CGI.

### 2. Receipt of Avoidable Transfers

39.     CGI transferred $527,052.56 of the 2016 Patronage Dividend to Defendants (the "Patronage Dividend Transfers") as indicated on the Patronage Dividend Transfer Schedule attached as Exhibit G-1.

40.     CGI transferred $229,552.06 of the 2016 Allowance Dividend to Defendants (the "Allowance Dividend Transfer") as indicated on the Allowance Dividend Transfer Schedule attached as Exhibit G-2.

41.     CGI transferred $235,014.00 to Defendants as Redemption Payments as indicated on the Redemption Payment Schedule attached as Exhibit G-3.

42.     On March 13, 2019, the Trustee sent demand letters to Defendants (the "Demand Letter"), demanding payment for the Unpaid Receivable, the Patronage Dividend Transfers, the Allowance Dividend Transfers, and the Redemption Payments.[8]  Defendants did not remit payment to the Trustee.

---

[8] The Demand Letter is attached as Exhibit H.

## C.  CGI'S INSOLVENCY

43.    CGI was insolvent by August 2016.  Although it did not file for bankruptcy until May 2017, CGI was doomed to fail long before then.  Its financial performance suffered dramatically throughout 2016 and 2017, largely driven by SVT's challenges.  As SVT struggled, it purchased less, and, because it was CGI's primary customer, CGI's cash flow declined.  In addition, reduced purchases from SVT caused CGI's overall purchase volume to shrink enough to reduce its margins and affect the Members' patronage rebate.  This effect, in turn, made CGI less attractive to customers and potential customers.

44.    Even after CGI recognized a $67 million in impairments at the end of fiscal 2016, its balance sheet still overstated the company's financial condition.  CGI had significant contingent liabilities that reduced the true value of the company.  These liabilities included approximately $95 million in unfunded pension withdrawal liability.  CGI also overvalued certain assets.  The 2016 year-end balance sheet valued its distribution center at $70 million.  It sold for just $61 million in July 2017.  In addition, CGI valued its interest in SVT at $94 million, but SVT's EBITDA was plummeting.  SVT was also saddled with pension fund liabilities.  Given the CGI Appointees' refusal to sell SVT untethered to a long-term purchasing contract, by August 2016 CGI should have valued its interest in SVT at something close to zero, not $94 million.  Moreover, CGI and SVT were highly leveraged yet had thin operating margins, making them especially vulnerable to downturns in their businesses.

45.    After the CGI Board approved the September 2016 patronage rebate, CGI's lenders expressed "great concern as to the direction of the Company."  If CGI paid the dividend, it would violate its liquidity covenants, so the banks required CGI to hold back 30% of the rebate.  CGI never recovered enough to pay the deferred amount.

46.     Finally, the CGI bankruptcy has resulted in massive losses for CGI's secured and unsecured creditors.  The CGI estate faces unpaid creditor claims of approximately $361,800,000, and it will only ever be able to pay back a small fraction of this amount.  CGI filed for bankruptcy in May 2017.  There were no major unforeseen events impacting the value of CGI between July 31, 2016 (the close of CGI's fiscal year) and the time it filed bankruptcy.

## CAUSES OF ACTION

### COUNT ONE
**Turnover of Property**
**Pursuant to 11 U.S.C. § 542(b) – Unpaid Receivable**
**(Against All Defendants)**

47.     The Trustee re-alleges the allegations set forth in the above paragraphs.

48.     Defendants received goods on account from CGI in the amount of the Unpaid Receivable.

49.     Defendants did not remit payment to CGI for the Unpaid Receivable.

50.     CGI's bankruptcy estate (the "CGI Estate") is entitled to payment of the Unpaid Receivable plus costs, expenses, and statutory interest under 815 Ill. Comp. Stat. Ann. 205/2.

51.     Defendants are in possession, custody, and/or control of the Unpaid Receivable.

52.     The Unpaid Receivable constitutes a matured, payable on demand, valid and existing debt, due and owing by Defendants to the CGI Estate.

53.     The Unpaid Receivable is property of the CGI Estate under 11 U.S.C. § 541(a), and thus subject to turnover pursuant to 11 U.S.C. § 542(b).

54.     Accordingly, the Trustee seeks turnover of the Unpaid Receivable.  In addition, pursuant to Article XV of the By-Laws and Section 13 of the Rules & Regulations, the Trustee seeks to recover reasonable attorney's fees, court costs, and all other expenses and costs incurred in recovering the Unpaid Receivable.

## COUNT TWO
### Breach of Contract
### (Against All Defendants)

55.     Pleading in the alternative to Count One, the Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

56.     The Purchasing Arrangement is a valid and enforceable contract governed by the course of dealing between the parties, the By-Laws, and the Rules & Regulations.

57.     Pursuant to the Purchasing Arrangement, Defendants received goods on account from CGI in the amount of the Unpaid Receivable.

58.     CGI fully performed its obligations under the Purchasing Arrangement.

59.     Defendants did not maintain an open ACH account to satisfy all amounts owed to CGI for goods purchased on account, and Defendants otherwise failed to remit payment.

60.     The Trustee sent Defendants the Demand Letter.

61.     Defendants failed to pay the Unpaid Receivable and thus materially breached the Purchasing Arrangement, the By-Laws, and the Rules & Regulations.

62.     The CGI Estate is entitled to payment of the Unpaid Receivable.

63.     As a result of their breach, Defendants have caused CGI to incur damages in an amount equal to, at least, the Unpaid Receivable plus costs, expenses, and statutory interest under 815 Ill. Comp. Stat. Ann. 205/2.

64.     Accordingly, the Trustee seeks to recover these damages.  In addition, pursuant to Section XV of the By-Laws and Section 13 of the Rules & Regulations, the Trustee seeks to recover reasonable attorney's fees, court costs, and all other expenses and costs incurred recovering the Unpaid Receivable.

**COUNT THREE**
**Avoidance of Fraudulent Obligations**
**Pursuant to 11 U.S.C. § 548(a)(1)(B) – 2016 Patronage Dividend**
**(Against All Defendants)**

65.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

66.     On or within two years before the Petition Date, CGI authorized the 2016 Patronage Dividend.

67.     The 2016 Patronage Dividend constitutes an obligation incurred by CGI.

68.     CGI incurred this obligation for the benefit of the Defendants.

69.     CGI received less than reasonably equivalent value in exchange for incurring this obligation.

70.     CGI was insolvent at the time of or as a result of incurring this obligation.  CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI incurred this obligation.

71.     Accordingly, the Trustee seeks to avoid the 2016 Patronage Dividend obligation pursuant to 11 U.S.C. § 548(a)(1)(B).

**COUNT FOUR**
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 548(a)(1)(B) – Patronage Dividend Transfers**
**(Against All Defendants)**

72.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

73.     On or within two years before the Petition Date, CGI transferred the Patronage Dividend Transfers to the Defendants.

74.     The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

75.     The Patronage Dividend Transfers were made to or for the benefit of the Defendants.

76.     CGI received less than reasonably equivalent value in exchange for the Patronage Dividend Transfers.

77.     CGI was insolvent at the time of or as a result of the Patronage Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI made the Patronage Dividend Transfers.

78.     Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

**COUNT FIVE**
**Avoidance of Fraudulent Obligations**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – 2016 Patronage Dividend**
**(Against All Defendants)**

79.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

80.     On or within four years before the Petition Date, CGI authorized the 2016 Patronage Dividend.

81.     The 2016 Patronage Dividend constitutes an obligation incurred by CGI.

82.     CGI incurred this obligation for the benefit of the Defendants.

83.     CGI received less than reasonably equivalent value in exchange for incurring this obligation.

84.     CGI was insolvent at the time of or as a result of incurring this obligation.  CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the 2016 Patronage Dividend.

85.     Accordingly, the Trustee seeks to avoid the 2016 Patronage Dividend obligation pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

14

## COUNT SIX
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Patronage Dividend Transfers
### (Against All Defendants)

86.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

87.    On or within four years before the Petition Date, CGI transferred the Patronage Dividend Transfers to the Defendants.

88.    The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

89.    The Patronage Dividend Transfers were made to or for the benefit of the Defendants.

90.    CGI received less than reasonably equivalent value in exchange for the Patronage Dividend Transfers.

91.    CGI was insolvent at the time of or as a result of Patronage Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Patronage Dividend Transfers.

92.    Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).


## COUNT SEVEN
### Avoidance of Preferential Transfers
### Pursuant to 11 U.S.C. § 547(b) – Patronage Dividend Transfers
### (Against All Defendants)

93.    Pleading in the alternative to Counts Three through Six, the Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

94.    Defendants are insiders of CGI and SVT.

95.    Within one year before the Petition Date, CGI made the Patronage Dividend Transfers, or caused such transfers to be made, to Defendants.

15

96.     The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

97.     The Patronage Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

98.     The Patronage Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

99.     CGI was insolvent when the Patronage Dividend Transfers were made.

100.    The Patronage Dividend Transfers enabled Defendants to receive more than they would have received if: (a) such transfers had not been made; and (b) Defendants had received payment of the underlying debt pursuant to chapter 7 of the Bankruptcy Code.

101.    Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 547(b).

**COUNT EIGHT**
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/6(a) – Patronage Dividend Transfers**
**(Against All Defendants)**

102.    Pleading in the alternative to Counts Three through Six, the Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

103.    The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

104.    CGI received less than reasonably equivalent value in exchange for the Patronage Dividend Transfers.

105.    The Patronage Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

106.    The Patronage Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

107.    CGI was insolvent when the Patronage Dividend Transfers were made.

108.   Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/6(a).

## COUNT NINE
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/6(b) – Patronage Dividend Transfers
### (Against All Defendants)

109.   Pleading in the alternative to Counts Three through Six, the Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

110.   Defendants are insiders of CGI and SVT.

111.   CGI made the Patronage Dividend Transfers, or caused such transfers to be made, to Defendants.

112.   The Patronage Dividend Transfers constitute transfers of an interest in CGI's property.

113.   The Patronage Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

114.   The Patronage Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

115.   CGI was insolvent when the Patronage Dividend Transfers were made.

116.   The Defendants had reasonable cause to believe that CGI was insolvent at the time of Patronage Dividend Transfers.

117.   Accordingly, the Trustee seeks to avoid the Patronage Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/6(b).

## COUNT TEN
### Avoidance of Fraudulent Obligations
### Pursuant to 11 U.S.C. § 548(a)(1)(B) – Allowance Dividend Transfers
### (Against All Defendants)

118.   The Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

119.   CGI had no obligation to make the Allowance Dividend Transfers.

120.   If, however, CGI had an obligation to make the Allowance Dividend Transfers, that obligation was incurred on or within two years before the Petition Date.

121.   If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI did so for the benefit of the Defendants.

122.   If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI received less than reasonably equivalent value in exchange for doing so.

123.   If CGI had an obligation to make the Allowance Dividend Transfers, CGI was insolvent at the time of or as a result of incurring that obligation.  CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Allowance Dividend Transfers.

124.   Accordingly, to the extent that CGI incurred any obligation to make the Allowance Dividend Transfers, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 548(a)(1)(B).

## COUNT ELEVEN
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 548(a)(1)(B) – Allowance Dividend Transfers
### (Against All Defendants)

125.   The Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

126.   On or within two years before the Petition Date, CGI made the Allowance Dividend Transfers to the Defendants.

127.   The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

128.   The Allowance Dividend Transfers were made to or for the benefit of the Defendants.

129.   CGI received less than reasonably equivalent value in exchange for the Allowance Dividend Transfers.

130.    CGI was insolvent at the time of or as a result of the Allowance Dividend Transfers. CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time that CGI made the Allowance Dividend Transfers.

131.    Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

### COUNT TWELVE
**Avoidance of Fraudulent Obligations**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Allowance Dividend Transfers**
**(Against All Defendants)**

132.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

133.    CGI had no obligation to make the Allowance Dividend Transfers.

134.    If, however, CGI incurred an obligation to make the Allowance Dividend Transfers, that obligation was incurred within four years before the Petition Date.

135.    If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI did so for the benefit of the Defendants.

136.    If CGI incurred an obligation to make the Allowance Dividend Transfers, CGI received less than reasonably equivalent value in exchange for doing so.

137.    If CGI had an obligation to make the Allowance Dividend Transfers, CGI was insolvent at the time of or as a result of incurring that obligation.  CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Allowance Dividend Transfers.

138.    Accordingly, to the extent that CGI incurred any obligation to make the Allowance Dividend Transfers, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

## COUNT THIRTEEN
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Allowance Dividend Transfers
### (Against All Defendants)

139.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

140.    On or within four years before the Petition Date, CGI made the Allowance
Dividend Transfers to the Defendants.

141.    The Allowance Dividend Transfers constitute transfers of an interest in CGI's
property.

142.    The Allowance Dividend Transfers were made to or for the benefit of the
Defendants.

143.    CGI received less than reasonably equivalent value in exchange for the Allowance
Dividend Transfers.

144.    CGI was insolvent at the time of or as a result of Allowance Dividend Transfers.
CGI also was engaged in a business or transaction, or was about to engage in a business or
transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or
believed that it would incur, debts that were beyond its ability to pay as such debts matured at the
time of the Allowance Dividend Transfers.

145.    Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers
pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

## COUNT FOURTEEN
### Avoidance of Preferential Transfers
### Pursuant to 11 U.S.C. § 547(b) – Allowance Dividend Transfers
### (Against All Defendants)

146.    Pleading in the alternative to Counts Ten through Thirteen, the Trustee re-alleges
the allegations set forth in paragraphs 1 through 46.

147.    Defendants are insiders of CGI and SVT.

148.    Within one year before the Petition Date, CGI made the Allowance Dividend
Transfers, or caused such transfers to be made, to Defendants.

149.    The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

150.    The Allowance Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

151.    The Allowance Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

152.    CGI was insolvent when the Allowance Dividend Transfers were made.

153.    The Allowance  Dividend Transfers enabled Defendants to receive more than they would have received if: (a) such transfers had not been made; and (b) Defendants had received payment of the underlying debt pursuant to chapter 7 of the Bankruptcy Code.

154.    Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers pursuant to 11 U.S.C. § 547(b).

**COUNT FIFTEEN**
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/6(a) – Allowance Dividend Transfers**
**(Against All Defendants)**

155.    Pleading in the alternative to Counts Ten through Thirteen, the Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

156.    The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

157.    CGI received less than reasonably equivalent value in exchange for the Allowance Dividend Transfers.

158.    The Allowance Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

159.    The Allowance Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

160.    CGI was insolvent when the Allowance Deposit Transfers were made.

161.    Accordingly, the Trustee seeks to avoid the Allowance Deposit Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/6(a).

## COUNT SIXTEEN
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/6(b) – Allowance Dividend Transfers
### (Against All Defendants)

162.    Pleading in the alternative to Counts Ten through Thirteen, the Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

163.    Defendants are insiders of CGI and SVT.

164.    CGI made the Allowance Dividend Transfers, or caused such transfers to be made, to Defendants.

165.    The Allowance Dividend Transfers constitute transfers of an interest in CGI's property.

166.    The Allowance Dividend Transfers were made to or for the benefit of Defendants, which were creditors of CGI.

167.    The Allowance Dividend Transfers were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

168.    CGI was insolvent when the Allowance Dividend Transfers were made.

169.    The Defendants had reasonable cause to believe that CGI was insolvent at the time of Allowance Dividend Transfers.

170.    Accordingly, the Trustee seeks to avoid the Allowance Dividend Transfers pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/6(b).

## COUNT SEVENTEEN
### Avoidance of Fraudulent Obligations
### Pursuant to 11 U.S.C. § 548(a)(1)(B) – Redemption Payments
### (Against All Defendants)

171.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

172.    CGI had no obligation to make the Redemption Payments.

173.   If, however, CGI had an obligation to make the Redemption Payments, that obligation was incurred on or within two years before the Petition Date.

174.   If CGI incurred an obligation to make the Redemption Payments, CGI did so for the benefit of Defendants.

175.   If CGI incurred an obligation to make the Redemption Payments, CGI received less than reasonably equivalent value in exchange for doing so.

176.   If CGI had an obligation to make the Redemption Payments, CGI was insolvent at the time of or as a result of incurring that obligation.   CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.   CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Redemption Payments.

177.   Accordingly, to the extent that CGI incurred any obligation to make the Redemption Payments, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 548(a)(1)(B).

### COUNT EIGHTEEN
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 548(a)(1)(B) – Redemption Payments**
**(Against All Defendants)**

178.   The Trustee re-alleges the allegations set forth in the above paragraphs in paragraphs 1 through 46.

179.   On or within two years before the Petition Date, CGI made the Redemption Payments to Defendants.

180.   The Redemption Payments constitute transfers of an interest in CGI's property.

181.   The Redemption Payments were made to or for the benefit of Defendants.

182.   CGI received less than reasonably equivalent value in exchange for the Redemption Payments.

183.    CGI was insolvent at the time of or as a result of the Redemption Payments.  CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Redemption Payments.

184.    Accordingly, the Trustee seeks to avoid the Redemption Payments pursuant to 11 U.S.C. § 548(a)(1)(B).

**COUNT NINETEEN**
**Avoidance of Fraudulent Obligations**
**Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Redemption Payments**
**(Against All Defendants)**

185.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

186.    CGI had no obligation to make the Redemption Payments.

187.    If, however, CGI incurred an obligation to make the Redemption Payments, CGI did so on or within four years before the Petition Date.

188.    If CGI incurred an obligation to make the Redemption Payments, CGI did so for the benefit of Defendants.

189.    If CGI incurred an obligation to make the Redemption Payments, CGI received less than reasonably equivalent value in exchange for doing so.

190.    If CGI had an obligation to make the Redemption Payments, CGI was insolvent at the time of or as a result of incurring that obligation.  CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of incurring any obligation to make the Redemption Payments.

191.    Accordingly, to the extent that CGI incurred any obligation to make the Redemption Payments, the Trustee seeks to avoid that obligation pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

## COUNT TWENTY
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5 – Redemption Payments
### (Against All Defendants)

192.    The Trustee re-alleges the allegations set forth in the above paragraphs in paragraphs 1 through 46.

193.    On or within four years before the Petition Date, CGI made the Redemption Payments to Defendants.

194.    The Redemption Payments constitute transfers of an interest in CGI's property.

195.    The Redemption Payments were made to or for the benefit of Defendants.

196.    CGI received less than reasonably equivalent value in exchange for the Redemption Payments.

197.    CGI was insolvent at the time of or as a result of Redemption Payments.  CGI also was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital.  CGI, moreover, intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured at the time of the Redemption Payments.

198.    Accordingly, the Trustee seeks to avoid the Redemption Payments pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/5(a)(2).

## COUNT TWENTY-ONE
### Avoidance of Preferential Transfers
### Pursuant to 11 U.S.C. § 547(b) – Redemption Payments
### (Against All Defendants)

199.    Pleading in the alternative to Counts Seventeen through Twenty, the Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

200.    Defendants are insiders of CGI and SVT.

201.    Within one year before the Petition Date, CGI made the Redemption Payments, or caused such transfers to be made, to Defendants.

202.    The Redemption Payments constitute transfers of an interest in CGI's property.

203.    The Redemption Payments were made to or for the benefit of Defendants, which were creditors of CGI.

204.    The Redemption Payments were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

205.    CGI was insolvent when the Redemption Payments were made.

206.    The Redemption Payments enabled Defendants to receive more than they would have received if: (a) such transfers had not been made; and (b) Defendants had received payment of the underlying debt pursuant to chapter 7 of the Bankruptcy Code.

207.    Accordingly, the Trustee seeks to avoid the Redemption Payments pursuant to 11 U.S.C. § 547(b).

## COUNT TWENTY-TWO
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/6(a) – Redemption Payments
### (Against All Defendants)

208.    Pleading in the alternative to Counts Seventeen through Twenty, the Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

209.    The Redemption Payments constitute transfers of an interest in CGI's property.

210.    CGI received less than reasonably equivalent value in exchange for the Redemption Payments.

211.    The Redemption Payments were made to or for the benefit of Defendants, which were creditors of CGI.

212.    The Redemption Payments were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

213.    CGI was insolvent when the Redemption Payments were made.

214.    Accordingly, the Trustee seeks to avoid the Redemption Payments pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/6(a).

## COUNT TWENTY-THREE
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/6(b) – Redemption Payments
### (Against All Defendants)

215.     Pleading in the alternative to Counts Seventeen through Twenty, the Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

216.     Defendants are insiders of CGI and SVT.

217.     CGI made the Redemption Payments, or caused such transfers to be made, to Defendants.

218.     The Redemption Payments constitute transfers of an interest in CGI's property.

219.     The Redemption Payments were made to or for the benefit of Defendants, which were creditors of CGI.

220.     The Redemption Payments were made for or on account of one or more antecedent debts owed by CGI to Defendants prior to the date on which such transfers were made.

221.     CGI was insolvent when the Redemption Payments were made.

222.     The Defendants had reasonable cause to believe that CGI was insolvent at the time of Redemption Payments.

223.     Accordingly, the Trustee seeks to avoid the Redemption Payments pursuant to 11 U.S.C. § 544(b)(1) and 740 Ill. Comp. Stat. Ann. 160/6(b).

## COUNT TWENTY-FOUR
### Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)
### (Against All Defendants)

224.     The Trustee re-alleges the allegations set forth in paragraphs 1 through 223.

225.     The Patronage Dividend Transfers, the Allowance Dividend Transfers, and the Redemption Payments are subject to avoidance pursuant to 11 U.S.C. §§ 544(b), 547(b), and 548(a)(1)(B).

226.     The Defendants received the Patronage Dividend Transfers, the Allowance Dividend Transfers, and the Redemption Payments as the initial transferees.

27

227.    Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trustee seeks to recover the value of the Patronage Dividend Transfers, the Allowance Dividend Transfers, and the Redemption Payments from the Defendants.

### COUNT TWENTY-FIVE
### Unjust Enrichment
### (Against All Defendants)

228.    Pleading in the alternative to Counts One through Twenty-Four, the Trustee re-alleges the allegations set forth in paragraphs 1 through 46.

229.    Defendants received benefits—at CGI's expense—in connection with the Purchasing Arrangement, the Loan Documents, and certain avoidable transfers.  Specifically, Defendants received benefits associated with the Unpaid Receivable, Patronage Dividend Transfers, the Allowance Dividend Transfers, and the Redemption Payments.

230.    Defendants have unjustly retained these benefits to CGI's detriment, even though the Trustee has attempted to recover these benefits through the Demand Letter.

231.    Retention of these benefits by Defendants violates fundamental principles of justice, equity, and good conscience.

232.    Accordingly, the Trustee seeks to recover the amount by which Defendants have been unjustly enriched.

### COUNT TWENTY-SIX
### Disallowance of Claims Pursuant to 11 U.S.C. § 502
### (Against All Defendants)

233.    The Trustee re-alleges the allegations set forth in paragraphs 1 through 232.

234.    This count is asserted against Defendants to the extent that any claims have been filed by or scheduled on behalf of Defendants against the CGI Estate.

235.    Defendants are persons or entities from which property is recoverable under 11 U.S.C. §§ 542 and 550 (the "Recoverable Property").

236.    Defendants have not turned over the Recoverable Property to the CGI Estate.

237.     Accordingly, pursuant to 11 U.S.C. § 502(d), the Trustee hereby objects to and seeks disallowance of any claims by Defendants against the CGI Estate.  Moreover, pursuant to 11 U.S.C. § 502(j), the Trustee seeks reconsideration and disallowance of any claims by Defendants against the CGI Estate to the extent that such claims have been allowed by this Court.

## CONDITIONS PRECEDENT

238.     All conditions precedent to the Trustee's claims for relief have been performed or have occurred.

## PRAYER

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against the Defendants as follows:

a.     directing turnover of the Unpaid Receivable, plus costs, expenses, attorney's fees, and interest, or, in the alternative, awarding as damages the amount of the Unpaid Receivable, plus costs, expenses, attorney's fees, and interest;

b.     avoiding the 2016 Patronage Dividend obligation;

c.     avoiding the Patronage Dividend Transfers and directing that the value of the Patronage Dividend Transfers be paid to the Trustee;

d.     avoiding any obligation to make the Allowance Dividend Transfers;

e.     avoiding the Allowance Dividend Transfers and directing that the value of the Allowance Dividend Transfers be paid to the Trustee;

f.     avoiding any obligation to make the Redemption Payments;

g.     avoiding the Redemption Payments and directing that the value of the Redemption Payments be paid to the Trustee;

h.     awarding recovery of unjust benefits and disgorgement of all ill-gotten gains;

i.     disallowing any claims filed by or scheduled on behalf of Defendants against the CGI Estate;

j.     reconsidering and disallowing any claims filed by or scheduled on behalf of Defendants against the CGI Estate;

k.      awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

l.      awarding reasonable attorney's fees and expenses, together with all costs of court; and

m.      granting such other and further relief, at law or equity, as this Court deems just and proper.

Dated: November 19, 2019                    Respectfully submitted,

/s/ Leo B. Oppenheimer
Eric D. Madden (admitted *pro hac vice*)
J. Benjamin King (admitted *pro hac vice*)
Leo B. Oppenheimer (admitted *pro hac vice*)
REID COLLINS & TSAI LLP
1601 Elm Street, Suite 4200
Dallas, TX 75201
(214) 420-8900 (T)
(214) 420-8909 (F)
emadden@rctlegal.com
bking@rctlegal.com
loppenheimer@rctlegal.com

*Special Litigation Counsel to*
*Howard B. Samuels, Chapter 7 Trustee for the*
*Estates of Central Grocers, Inc., Strack and*
*Van Til Super Market, Inc., and SVT, LLC*

-and-

Michael M. Eidelman
William W. Thorsness
Allison B. Hudson
VEDDER PRICE P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601
(312) 609-7500 (T)
(312) 609-5005 (F)
meidelman@vedderprice.com
wthorsness@vederprice.com
ahudson@vedderprice.com

*Counsel to Howard B. Samuels, Chapter 7
Trustee for the Estates of Central Grocers,
Inc., Strack and Van Til Super Market, Inc.,
and SVT, LLC*